**Ernest Lee HARRIS, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. C14–82–225CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 13, 1984.

G. Michael Cooper, J. Ronald Vercher, Houston, for appellant.

Calvin Hartmann, Karen Zellars, Houston, for appellee.

Before JUNELL, MURPHY and SEARS, JJ.

## OPINION

SEARS, Justice.

We withdraw our original opinion in this cause and substitute the following opinion.

Appellant, Ernest Lee Harris, a/k/a Justine Delene LeBatti, was convicted of murder under TEX.PENAL CODE ANN. § 19.-02(a)(1) (Vernon 1974). The jury assessed punishment at life imprisonment and a $10,000.00 fine. We affirm.

 In Appellant's first ground of error he alleges that the evidence introduced at trial was insufficient to establish venue in Harris County. This argument, however, is made for the first time on appeal. TEX.CODE CRIM.PROC.ANN. art. 44.-24(a) (Vernon Supp.1984), instructs the court of appeals to presume that venue was proved in the trial court unless venue was either made an issue in the trial court or the record affirmatively appears to establish that venue was improper. *Arnold v. State*, 486 S.W.2d 345, 346. (Tex.Crim. App.1972); *Valdez v. State*, 156 Tex.Crim. 192, 240 S.W.2d 320, 321 (1951); *Valdez v. State*, 141 Tex.Crim. 52, 147 S.W.2d 246, 247 (1941). Venue can be made an issue by objecting or making a bill of exception, for each method alerts the trial court to the attack on the venue. In this case, however, Appellant neither objected nor made a bill of exception. Further, he did not affirmatively establish that venue was in another county.

Appellant cites us to a single remark in his Motion for Instructed Verdict which possibly could be related to venue. It states:

> The State of Texas has proved by circumstantial evidence alone that the Defendant was one of three people who probably transported the body of the victim from somewhere and dumped the victim in a body of water in the State of Louisiana.

He failed to specifically argue that venue is incorrect; therefore, the remark is insufficient to raise a challenge to the venue. *See Jojola v. State*, 624 S.W.2d 338 (Tex.App.— Eastland 1981, pet ref'd); *Masters v. State*,

306 S.W.2d 355, 356 (Tex.Crim.App.1957). Ground of error one is overruled.

Appellant next attacks the sufficiency of the evidence to uphold his conviction. We find no merit in this argument. However, due to the nature of the crime and the long chain of circumstantial evidence, a lengthy review of the testimony is necessary. We will review the evidence basically in the order of occurrence.

The victim, Lorelei Marie Wickers, a/k/a Delta S. Lee, a teenage runaway from New York, travelled to Texas with two other girls in January 1981. Shortly thereafter, Lorelei met Appellant, a self-admitted pimp, and began working for him as one of his prostitutes. Apparently his only other "girls" were his common-law wife, Sharon (Sheri, Sherri, Cheri) Rada, and Frankie Pesina.

In the spring of 1981, Rada and Lorelei worked in a massage parlor in Austin, Texas. In May or June 1981, they moved back to Houston and, along with Pesina, began working as hostesses and dancers at the Stone Fox Nude Dance Club. The club was near Appellant's apartment at 501 Greens Road, # 1406. George Banaduc, the owner and manager of the Stone Fox, was interviewed by Ron Adelberg, a special agent with the Houston Division of the Federal Bureau of Investigation (F.B.I.), who testified at trial. Banaduc told Adelberg that the girls also worked as prostitutes for Appellant and that Appellant always drove them to and from work. He also told Adelberg that the last time he saw Lorelei alive was around 8:00 or 9:00 p.m. on June 3, 1981, when she, Rada and Pesina finished their shift.

On June 5, 1981, at approximately 10:00 a.m., Johnny Williams discovered Lorelei's nude body while fishing in an alligator-infested canal in the Sabine National Wildlife Refuge in Cameron Parish, Louisiana. One ten-kilo weight was tied around her neck and one was tied around her ankles. The weights were attached with cotton rope and anchored both ends of her body; however her buttocks stuck out of the water, enabling Williams to see her. He

pulled her body partially onto the shore with his fishing rod, secured it and notified the authorities, who later recovered it.

Lehrue Stevens, M.D., performed the autopsy on Lorelei. He found large and multiple bruises all over her body; marks on her chest, breast and face that he believed were caused by cigarette burns; a fractured jaw; a hemorrhage on her liver surface; a tear in the capsule of her liver; a gunshot exit wound to her skull with the entry wound in the palate area of her mouth; and bruises and powder burns on her lips, probably caused by the recoil of a gun placed and fired in her mouth. Dr. Lehrue concluded that all of the injuries were pre-mortem, that Lorelei appeared to have been beaten and that she died as a result of massive cerebral damage caused by the gunshot. Dr. Lehrue also noticed post-mortem wounds. One such wound consisted of "pressure marks" on the left side of her body which he opined were made by either a cloth or rubber floor mat. Additionally, he noted that her blood had settled in the left side of her body. He estimated Lorelei had been dead for approximately thirty to thirty-five hours before her body was discovered. (She had last been seen alive approximately thirty-seven hours before the discovery of her body).

Other indentions on the body later were observed by James Supan, a special agent with the F.B.I. in Lake Charles, Louisiana. Supan discovered very small checkered patterns which could have been made by a matted material such as carpet; a handprint and fingerprints on her left arm, which later were found to be from the tightening grip of her own right hand; and what appeared to be zipper marks on her buttocks.

John C. Saunders, a fingerprint specialist for the F.B.I., saw the body on June 20, 1981. He took fingerprints of the victim. Later, they were matched with latent prints on Delta S. Lee's massage license application in Austin. Delta was determined to be Lorelei Marie Wickers.

Appellant, Rada and Pesina travelled to Lake Charles, Louisiana and met Tommy Geyen and Warren Landry in front of a bar on June 4, 1981. They were in a Thunderbird which Appellant had rented in Austin. Appellant said they were just passing through and needed some place to stop and rest. Landry offered his house. At about 5:00 p.m. that day, Geyen and Landry drove one car and Appellant, Rada and Pesina drove the Thunderbird down Highway 14 towards the Gulf of Mexico. Landry later decided to return to his house to prepare dinner, and Geyen got in the Thunderbird.

Appellant, Geyen, Rada and Pesina eventually arrived at the Sabine National Wildlife Refuge where Appellant found a ramp near the canal and backed up on it. Appellant told Geyen to go to another area to start a fire. He left for about twenty minutes and attempted to start a fire. During this time, Appellant, Rada and Pesina were alone by the Thunderbird. Geyen returned when Appellant asked him to help inflate a raft. He told Geyen that the girls wanted to go skinny dipping and would float out on the raft. While Geyen was assisting Appellant, he saw weights and cotton rope in the car trunk. Appellant said that the weights and rope were to keep the raft from floating too far away from the shore. After the raft was inflated, Appellant instructed Geyen to take the car to a store to buy gas and beer. Pesina accompanied him on the trip which took approximately thirty to forty-five minutes. On the return trip, Geyen lost control of the car and ran into the canal near the home of John Walther, the warden of the wildlife refuge. At Geyen's request, Walther called a wrecker to pull the car out of the canal and tow it to a storage facility. Walther also called the Cameron Sheriff Department and Deputy Archie L. Bourns arrived at the scene of the accident.

While waiting for the wrecker, Geyen and Pesina directed Walther to the place where they had left Appellant and Rada. The distance from the scene of the accident to the ramp where Appellant and Rada had remained was approximately one to one

and one-half miles. Walther testified that he did not see anyone at the ramp. Geyen began gesturing and Appellant and Rada emerged from the weeds where they had been hidden from view. Walther observed that Appellant was well-dressed and carried a gear or garment bag with a long zipper.

Bourns issued two citations, one to Appellant for allowing an unlicensed driver to drive his car and one to Geyen for driving without a license. Bourns also took the names of all four people involved. None of them offered any identification to Bourns but did provide correct names and addresses. Later, a diver found Pesina's purse, which contained her identification, near the location where the body was found.

Appellant called Landry to pick the four of them up and drive them back to Lake Charles. After Landry took Geyen home, they returned to his house and spent the night. The next day Appellant paid Landry to drive them back to Houston. The last time Landry saw them was in Houston after he had taken them to a U-Haul Truck Rental in north Houston near Appellant's Greens Road apartment.

On the morning of June 5, the sheriff's department dispatcher informed Bourns that a body had been found in a canal in the refuge. He did not at that time connect the body with the citations he had issued. Walther made the connection, though, when he learned from the sheriff's office that the body was found at the location Geyen had led him to pick up Appellant and Rada. He passed this information on to the sheriff's department and the search for Appellant, Rada and Pesina began.

Appellant's car was searched while it was in the salvage yard by Roger Rubrecht and James Supan, both of the F.B.I. They found Houston telephone books, a work order for the installation of a telephone for Delta Lee, carpet, a trunk liner, a utility knife package and various other items. The rope, weights and raft, which Geyen previously observed in the trunk, were no longer there. However, at that point in the investigation, the agents were unaware that those items had been seen in and removed from the car. They focused their attention on the utility knife package.

Supan determined that the knife came from White's Auto Store in Lake Charles. After talking to the manager of the store, he learned that a raft, rope and weights also had been purchased. The receipt showed that the sale occurred on June 4, 1981, one day before Lorelei's body was found.

Supan also talked to the two clerks who waited on the customer who made the purchase. They both described him as a well-dressed black man who wore a lot of flashy jewelry. They did not identify Appellant at trial. Further discussion with the clerks revealed that the purchaser had asked for more weights but was told that the store did not have any more. The clerks identified the raft box and pictures of the weights and ropes that were found at the scene of the crime as similar to those they had sold. Geyen also identified those items as similar to those he had seen in Appellant's trunk. Allan T. Robillard, a special agent with the F.B.I., compared rope samples provided by White's Auto Store with the rope used to tie the weights to Lorelei and determined that they had fairly unique composition and could have originated from the same manufacturer.

The Houston Division of the F.B.I. received the evidence from Appellant's car and contacted the Houston Police Department (H.P.D.). These items led to Appellant's empty apartment at 501 Greens Road, #1406. While at Appellant's apartment complex, Royce Logan and Ron Adelberg, both of whom were special agents with the F.B.I., interviewed several people. While speaking to Logan, who testified at trial, Appellant's next door neighbor described four individuals. The descriptions fit those of Appellant, Rada, Pesina and Lorelei. She also told Logan that a black woman, a white woman and two black men moved the belongings out of the apartment on the evening of either June 5 or 6, 1981. The U-Haul truck rented by Appellant on

June 6, which apparently was used to move the belongings, was discovered abandoned in a vacant lot in Las Cruces, New Mexico on June 16.

The investigation of the apartment revealed that a piece of carpet and padding had been cut out of the hallway and Lorelei's palm print was found on the left side of the lavatory in the bathroom. Officer Flowers cut samples of the carpet to match with the missing piece of carpet in the event it was found.

The matching piece of carpet was found approximately seven weeks later, on July 24, 1981, by Theos Duhon, the Chief Investigator for the Cameron Parish Sheriff Department in Louisiana. It was found in a ditch on a dead end road off of Highway 14, approximately one to two miles south of Lake Charles. Appellant and his party travelled via Highway 14 from Lake Charles to the site where Lorelei's body was found.

The H.P.D. Crime Lab determined that the stains on the carpet were composed of human blood. James Bolding, who ran the tests, could not type the blood because of the effect the weather and exposure had on both it and the carpet. Nevertheless, Robert H. Werkentin, a Chemist and Toxicologist with H.P.D., concluded that the samples of carpet taken from Appellant's apartment matched the piece of carpet which was found in Louisiana.

F.B.I. agent Leo Gonzales saw Rada in El Paso on July 3 and arrested her. She led Gonzales and other agents to Appellant's house where he was arrested. They were returned to Houston for trial. Pesina has never been apprehended.

■ In circumstantial evidence cases the evidence must exclude every reasonable hypothesis other than guilt of the accused. *Girard v. State,* 631 S.W.2d 162, 163 (Tex. Crim.App.1982). Each case is to be tried on its own particular set of facts. *Flores v. State,* 551 S.W.2d 364 (Tex.Crim.App. 1977). However, the court is *not* to ask whether *it* believes the evidence established guilt beyond a reasonable doubt.

Rather, it is to ask whether a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Girard,* 631 S.W.2d at 163.

We have carefully examined the evidence under the standard of review for convictions based on circumstantial evidence articulated in *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim.App.1983) (en banc). *Carlsen* stated that

A conviction based on circumstantial evidence must exclude every other reasonable hypothesis except the guilt of the accused. It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. Each fact need not point directly and independently to the guilt of the accused, as *the cumulative effect of all the incriminating facts may be sufficient to support the evidence.* However, proof which amounts only to strong suspicion or mere probability is insufficient.

*Id.* at 447 (cites omitted).

Having followed the mandates of the court of criminal appeals, we conclude that a rational trier of fact could have found from the cumulative circumstantial evidence that Appellant was guilty beyond a reasonable doubt. We further find that under the evidence introduced, every reasonable hypothesis other than the guilt of Appellant has been excluded. Ground of error two is overruled.

■ Appellant complains in his third ground of error that the trial court failed to apply the law of parties to the facts of the case and that the instructions did not require the jury to find Appellant committed any of the acts listed in TEX.PENAL CODE ANN. §§ 7.01 & 7.02(a)(2) (Vernon 1974). The court's charge read:

### III.

You are instructed that all persons are parties to an offense who are guilty of

acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another, if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone does not constitute one a party to an offense.

### IV.

Now if you find from the evidence beyond a reasonable doubt that on or about the 3rd day of June, 1981, in Harris County, Texas, the defendant, ERNEST LEE HARRIS, *either acting alone or together with another or others as a party, as that term has been defined,* did intentionally or knowingly cause the death of an individual, LORELEI MARIE WICKERS, by shooting her with a gun, then you will find the defendant guilty of murder, as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder. [emphasis added]

A similar instruction was upheld in *White v. State,* 385 S.W.2d 397 (Tex.Crim. App.1964). In *White,* the court defined the term "principal" and then told the jury that it could convict defendant only if they found that he was "acting alone or jointly as a principal, *as the term principal has been defined to you ....*" *Id.* at 400 (emphasis added). The court held that that charge "adequately protected the rights of the appellant." *Id.*

 Likewise, we find no defects in this court's charge. In Paragraph III, the court submitted the general legal principles involved by tracking the language of §§ 7.01 and 7.02(a)(2). Paragraph IV correctly applied the law to the facts by instructing the jury to acquit Appellant if they did not find that he, acting alone or as a party, "as that term [was] defined" committed the murder. We hold that this charge was proper and not erroneous.

This charge clearly does not suffer from the defects found in the charge at issue in *Apodaca v. State,* 589 S.W.2d 696 (Tex. Crim.App.1979), as Appellant argues. In applying the law of parties to the facts, the *Apodaca* jury was charged to find the defendant guilty if he, "as a *principal*" (emphasis added), was found to have committed the acts requisite to conviction. No mention of finding the defendant guilty as a *party* was made. Ground of error three is overruled.

We affirm the conviction.