Herbert Eugene BUTLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–84–00136–CR.

Court of Appeals of Texas,
San Antonio.

Nov. 13, 1985.

Charles Campion, San Antonio, for appellant.

Sam Millsap, Jr., Edwin Springer, Emil Holiner, Daniel Thornberry, Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, CANTU and REEVES, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from a conviction for the offense of murder, TEX. PENAL CODE ANN. § 19.02(a)(1)(Vernon 1974). A jury found appellant guilty and assessed punishment at thirty years' imprisonment.

Appellant brings two grounds of error: that error resulted when the trial court overruled his motion for mistrial and that the evidence is insufficient to support the conviction.

We first address the sufficiency question. The lawyer for the deceased, Juanita Butler, testified he represented her in a divorce action against her husband, the appellant. He stated she wanted him to file a temporary restraining order against appellant but could not afford one. The lawyer said that on February 2, 1983, appellant told him to dismiss the divorce since the couple were reconciling. Juanita then telephoned the lawyer saying she did not want the action dismissed but wanted to proceed with it.

Denise Homer, the niece of the deceased, testified her aunt was "supposed to have her divorce" on the same day she was shot, February 15, 1983. There was other evidence she was going to court for the divorce proceedings on that day. Denise also said there was a gun in the house before the couple separated, but she never saw it after appellant moved. Further, she said, her aunt had bought some new clothes for her children, bought some new furniture, and planned to move to Dallas. There was evidence that Juanita had been in Dallas with her sister on February 14th. She said Juanita never said anything about killing herself.

Living at the house with the deceased were two nieces, Denise (above) and Sylvia, together with the couple's children. Freeman, appellant's brother, and Sylvia had spent the night of the 14th together there. About 9:00 A.M. on the 15th of February appellant arrived at the residence, apparently to take the couple's seven-year-old daughter to a doctor because of a fall at

school. Instead of examining the child, he went directly to the bedroom where Juanita, the deceased, was asleep in the bed with the couple's three-year-old daughter. There was testimony he wore his shirt "out," covering his waist. He denied this.

Appellant testified he went into the bedroom and closed the door behind him. He said he attempted to wake Juanita and could not. But he said she told him to "wait a minute" just as he started to leave the room. He stated:

I turned around and she already stood up here and had a gun in her hand.... that was the entire conversation.

\* \* \* \* \* \*

She had the gun like this (indicating) just pointing it towards me; it looked like my face.

Appellant stated that by a karate blow, he "slapped the gun to her left and I grabbed it and threw her on the bed." Then he tried to "take it out of the open end [of her hand] ... twisting it out.... It went off." He said he told her when he first saw the gun, "Baby, don't shoot it; please don't shoot." After the shot was fired, his brother, Freeman, entered the room, grabbed the gun from her hand [he said it was the right hand] and put it under the pillow. Freeman testified he heard similar words before he heard the shot.

When the police arrived, appellant testified he reported to the first one that he and his wife had been wrestling over the gun and it went off. That police officer testified the appellant did not say anything about that. Appellant and his brother left and went to his parents' house. He went to the police station about two hours after the shooting. When asked by his counsel whether he explained to the police what happened, he said he did.

He affirmed that he was still dressed in the same clothes he had worn at the shooting. There was no evidence of blood stains on the clothes. He testified the gun was in the deceased's right hand when it discharged. [She was right-handed]. Later he stated he was not sure whether it was in

her hand or in both their hands. He did affirm he was very close to her ... obviously on top of her when the gun discharged.

The deceased's niece, Sylvia, stated the gun was on the bed when she came into the room and her aunt's *left* hand was lying on top of the handle. She said there was no gun in the house during the time she lived there. She also said the pajamas of the three-year-old (lying on the bed) had her mother's blood on them.

A forensic pathologist employed by Bexar County testified to the cause of death. In her autopsy of the body she found the entrance of the gunshot wound was located on the right frontal region of the deceased's head at the top of the skull. The bullet traveled sharply downward after passing through the brain, pushing out the left eye, and lodged in the muscle tissue of the left cheek.

The pathologist testified that of the hundreds of bodies she had examined, she had never seen this type of wound in a suicide. She stated this was not a close contact wound, and further, there were no signs of stippling or tatooing which occur when a person receives a gunshot wound at close range. She also stated her opinion that the wound was not self-inflicted.

Appellant contended that the deceased wore a hairpiece or Afro hair grease which might prevent stippling. It was shown that Juanita did own a "weave." The weave made for Juanita fit on the sides and back of her head. The top of her head had "natural" hair, according to her sister. There was no proof of "grease" on her head.

The medical examiner for Bexar County testified that stippling would occur up to a distance of about twenty-four inches. With a head wound the hair may filter out some tatooing after about eighteen inches. He stated the hairpiece worn by Juanita at the sides and back would have no effect because the entrance of the bullet was at the top of the head. It was shown the gun was a .38 caliber, and the bullet was "home loaded." Although appellant testified that

a gun of smaller caliber had been kept in a bedside table when he lived at the house, that table was located in another bedroom. In the bedroom where the shooting occurred there was no bedside table. Juanita did not, as a rule, sleep in the bedroom where the shooting occurred.

Appellant testified he left the scene to go downtown and explain to the police what happened. He talked with three detectives. Asked by defense counsel on cross-examination what appellant said in his oral statement at the police station "from your report," San Antonio Police Detective Richard Urbanek replied:

He stated that he went into the bedroom to wake up Juanita and that she produced a gun. He didn't know where from, and all of the sudden, she was shot and he didn't know anything more about it.

Upon redirect examination by the prosecution he replied to the question, "Did he tell you if she shot herself?" "No, sir." The officer said appellant indicated a memory lapse as to what happened. On re-cross-examination by appellant, he was asked again from his report who produced the gun. Again the detective stated his report reflected the oral statement by appellant that Juanita produced the gun.

The State questioned the seven-year-old and she related the .38 caliber gun in this case "looked like" the one she saw in her father's automobile. She was not so positive when questioned by the defense.

A firearms expert with the police department testified the spent bullet was not a factory load, rather the shell was reloaded by a home reloader. He agreed that if a person were shot from twenty inches away with that bullet from the .38 caliber gun, there would be tatooing (burned underskin—not washable) marks of a permanent nature.

Sylvia also testified she and Freeman slept the night before in the same bed occupied by the deceased and her small daughter after 8:30 a.m. She and Freeman left the bed so the others could sleep there. She said there was no gun in the bedroom the night before, and that Juanita did not bring a gun into the bedroom. She stated there was no gun in the house during the time she lived there. She said "she got shot with a .38 caliber, which was not hers."

Sylvia testified that her grandmother, Juanita's mother, telephoned immediately after the shooting and appellant answered the phone. After he spoke to the woman, he handed the phone to Sylvia.

The deceased's mother testified she spoke on the telephone with appellant and her husband listened on the extension. The State examined her:

Q: ... What did you say and what did Eugene say?

A: ... I said, 'Eugene, what is this I hear that you shot Patty in the head? ... Is that true.' And he said, 'Oh yes, ma'am, I did. I did it.' And I said, 'Why did you do that,' and he said, 'Oh, wait a minute. I'll let Lynn [Sylvia Lynn] tell you about that.'

The mother testified her daughter had a .22 caliber pistol which had been stolen the summer before, but that she did not have a .38 caliber. Further, she said she had told her daughter to buy another gun for protection, but the deceased refused to do so. The deceased's father confirmed he heard the noted conversation on the telephone extension. Both parents said their daughter was in good spirits.

Sylvia, the brother, Freeman, and the seven-year-old daughter said they heard appellant's voice just before the one shot was fired, shouting, "No, Patty, don't shoot; don't shoot, Patty." (Or similar words). [The deceased was called "Patty"].

The jury charge in this case included instructions on the lesser offenses of voluntary manslaughter and involuntary manslaughter (reckless conduct), and on the defensive theories of lack of voluntary conduct by appellant during a struggle over the gun (formerly "accident"), and self-defense. The jury found appellant guilty of murder.

█ This is a circumstantial evidence case, and the standard of review is no different than that in a direct evidence case: whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Wilson v. State*, 654 S.W.2d 465, 471 (Tex. Crim.App.1983), *see Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a circumstantial evidence case if the evidence supports an inference other than the guilt of the defendant, a finding of guilty beyond a reasonable doubt is not a rational finding. *Wilson v. State, supra*, at 472. The test has been retained by the Court of Criminal Appeals that under the particular facts of each case, a conviction on circumstantial evidence cannot stand if the circumstances proved do not exclude every other reasonable hypothesis except that of the guilt of the accused and proof amounting only to strong suspicion or mere probability is insufficient. *Id.* at 468–69. (Citations omitted).

█ It is not required that the circumstances should, to a moral certainty, exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Crim.App.1983). Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the conclusion. Proof that amounts only to a strong suspicion or mere probability is insufficient. *Id.* at 447. (Citations omitted).

█ By the defensive theories presented to the jury, that body could consider whether or not the evidence showed that the deceased may have suffered a self-inflicted wound, either intentionally inflicted or by accident; whether or not the appellant acted in self-defense; and whether or not the death by shooting constituted voluntary or involuntary manslaughter.

In reviewing all the evidence, we conclude that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. Any inconsistencies or conflicts in the trial testimony and evidence were before the jury, who were the judges of the facts, the credibility of the witnesses, and the weight to be given the testimony. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982). The jury may believe some witnesses and refuse to believe others, and it may accept portions of the testimony of a witness and reject other portions. *Id.* (Citations omitted). Reconciliation of conflicts and contradictions in the evidence is within the province of the jury, and such conflicts will not call for reversal if there is enough credible testimony to support the conviction. *Id.* The second ground of error is overruled.

█ In the remaining ground of error appellant complains of error as enunciated in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Prosecution questions concerning a defendant's post-arrest silence may violate the accused's constitutional rights guaranteed by U.S. CONST. amend. V and amend. XIV. The general rule is that once a defendant voluntarily takes the stand he is subject to the same rules as any other witness; he may be impeached, contradicted, made to give evidence against himself, cross-examined as to new matters, and treated in every respect as any other witness testifying in his own behalf except when there are overriding constitutional or statutory prohibitions. *Cuellar v. State*, 613 S.W.2d 494, 495 (Tex.Crim.App.1981) (citing *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (where a defendant takes the stand and casts aside his cloak of silence).

*Cuellar, supra* at 495, pointed out that such use of a defendant's silence after arrest is one of these constitutional exceptions because it would be fundamentally unfair to allow an arrestee's post-arrest silence to be used to impeach an explanation subsequently given at trial after the accused had impliedly been assured of his right to silence. The court noted that post-arrest silence is insolubly ambiguous.

The facts in the instant case place the oral statement made by appellant to the detectives outside the ambit of the constitutional protection as prescribed by *Doyle v. Ohio, supra,* and its progeny. These are the distinctions: appellant did not choose to remain silent; he testified he voluntarily went to the police station to give them an explanation; his oral statement is exculpatory and self-serving—"Juanita produced the gun." Further, upon cross-examination of the detective, appellant immediately brought out the exact contents of the oral statement. The statement is consistent with his defensive theory that the deceased had the gun. Thus, it is unlikely the statement could have been utilized for impeachment purposes because of inconsistency. TEX. CODE CRIM.PROC.ANN. art. 38.22, § 5 (Vernon 1979).

Appellant's stated purpose in going to the police station was to talk, not to remain silent. After *Miranda* warnings, appellant did not wish to give a written statement. When the detective first said, "He did not want to ...," the careful trial judge *sua sponte,* instructed the jury not to consider the question and answer. The subsequent in chambers hearing resulted in the overruling of a motion for mistrial based on the prosecution question. After the admonition by the court in chambers, the prosecutor stated, "We'll just stop right there." Before the jury again, the State did not pursue the matter of an oral statement.

However, on cross-examination appellant required the detective to read the contents of the oral statement from his report. Subsequently appellant himself testified to what he told the detectives.

We hold no *Doyle v. Ohio* violation has been shown because appellant chose not to remain silent, and his own evidence showed this. It is axiomatic that a defendant may not complain of facts which he has adduced. We overrule the ground of error.

The judgment of the trial court is affirmed.

CANTU, Justice, dissenting.

As noted by the majority, a conviction based upon circumstantial evidence cannot stand if the circumstances proved do not exclude every reasonable hypothesis other than the guilt of the accused. *Wilson v. State,* 654 S.W.2d 465 (Tex.Crim.App.1983). The question on review is whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, appellant's conviction cannot stand unless the evidence negates every reasonable hypothesis except the guilt of appellant. *O'Keefe v. State,* 687 S.W.2d 345 (Tex.Crim.App.1985). Where the evidence supports an inference other than the guilt of appellant, a finding of guilt beyond a reasonable doubt is not a rational finding. *Id.*

The appellant herein never denied having shot Juanita Butler, nor did he contend that her death was a suicide. Appellant simply maintained that Juanita was fatally injured in a struggle over the gun.

This reasonable hypothesis was sufficiently established by the circumstances proven at trial. The testimony of Roland Freeman and Sylvia Homer was contradictory regarding in which of Juanita's hands the gun was found. However, even if it is assumed that the gun was in Juanita's left hand and that she was right handed, such would not necessarily indicate appellant's guilt rather than support the hypothesis that Juanita was injured during a struggle.

The absence of stippling marks does not prove that the gun was fired from a great distance. Rather, Dr. May testified that the weapon could have been discharged as close as one foot from the victim's head without leaving powder burns. Additionally, there was evidence that the deceased used a hair grease, and wore a hair weave; both of which could reduce or eliminate the presence of stippling marks, according to both Dr. DiMaio and Dr. May.

The trajectory of the bullet is not inconsistent with appellant's hypothesis that the gun discharged during a struggle either.

Dr. May only testified that the trajectory was inconsistent with a self-inflicted wound, leading her to conclude that Juanita Butler had not committed suicide. She did not address the possibility that the wound resulted from a struggle between appellant and Juanita. Thus, there was no forensic evidence at trial to preclude appellant's hypothesis that the injury was the result of a struggle.

Appellant testified that he did not speak to Juanita's parents on the telephone after the shooting. Roland Freeman testified that appellant did not receive any calls while at the Butler residence. Even assuming arguendo, that appellant did speak to Mrs. Homer and did admit shooting Juanita, such admission is not inconsistent with his hypothesis that Juanita was shot during a struggle. Rather, appellant consistently explained that all of the sudden there was a gun, and Juanita was shot during a struggle to disarm her.

At trial the State attempted to show that appellant had brought a weapon to his wife's home and deliberately shot her. Appellant was not seen with a gun on the day in question, however, he had been known to carry a weapon in the past. It was also established that Juanita Butler was known to carry a gun on occasion, and had kept one at her house.

Witnesses for both the State and appellant testified that the gun found in Juanita's hand was similar to guns carried by the appellant and Juanita on past occasions. Thus it was not shown that the gun belonged to either appellant or Juanita. The mere fact that the gun resembled one owned by appellant does not establish that the gun found belonged to appellant anymore than it establishes that it belonged to Juanita. Similarly, the fact that appellant may have arrived at the Butler house with his shirt tails untucked does not permit on inference that appellant brought a gun with him, absent evidence that a bulge was visible under his shirt, or other incriminating circumstances.

Irrespective of whether appellant brought the gun with him or Juanita had the gun in her room, the evidence did not establish that appellant intentionally and knowingly shot his wife while at the same time excluding every other reasonable hypothesis. Appellant contends that Juanita was injured in a struggle over the weapon, and the State did not bring forth evidence to rebut this contention.

Thus, having viewed the evidence at trial in the light most favorable to the prosecution, the premise that appellant engaged in a struggle with Juanita Butler which resulted in her death, was not excluded to a moral certainty. *Wilson v. State, supra* at 467. A rational finder of fact could not have found the essential elements of murder beyond a reasonable doubt in view of the outstanding reasonable hypothesis that Juanita's death resulted from a gunshot wound following a struggle between Juanita and appellant. The United States Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Therefore, I would sustain appellant's challenge to the sufficiency of the evidence to support his conviction. I respectfully dissent.